307 Ga. 855
FINAL COPY

S19A1147.  MITCHELL v. THE STATE.

WARREN, Justice.

Sandy Mitchell, Jr., was convicted of malice murder and other crimes in connection with the shooting death of Byron Brown.[1]  On appeal, Mitchell contends that his trial counsel was constitutionally ineffective for failing to object to certain trial testimony from a detective in this case on the grounds that it was improper expert opinion, and that other testimony offered by the same detective was

---

[1] The crimes occurred on September 23, 2012.  On February 4, 2015, a Muscogee County grand jury indicted Mitchell for the malice murder of Brown; felony murder predicated on the aggravated assault of Brown; and possession of a firearm during the commission of a felony.  At a trial held from June 3 to 7, 2015, the jury found Mitchell guilty of all counts.  The trial court sentenced Mitchell to life in prison for malice murder and five years consecutive for possession of a firearm during the commission of a felony.  Although the trial court purported to merge the felony murder count into the malice murder conviction, that count was actually vacated by operation of law.  See *Malcolm v. State*, 263 Ga. 369, 372 (434 SE2d 479) (1993).  Mitchell filed a motion for out-of-time appeal, which the trial court granted, and then filed a motion for new trial on May 2, 2017.  That motion was later amended through new counsel, and, on February 21, 2019, was denied (as amended) after a hearing.  On March 11, 2019, Mitchell filed a timely notice of appeal, and the case was docketed in this Court for the August 2019 term and submitted for a decision on the briefs.

admitted in violation of *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963). Mitchell also contends that the trial court erred in permitting the detective to testify about the alleged *Brady* violation evidence and in admitting a particular autopsy photograph into evidence. For the reasons that follow, we disagree and affirm Mitchell's convictions.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at Mitchell's trial showed the following. In the early morning hours of September 23, 2012, after spending time with a friend who was staying at a Motel 6 in Columbus, Mitchell had an employee of the motel call a taxi. Brown was the taxi driver who picked Mitchell up from the motel at approximately 2:00 a.m. According to Mitchell's later statement to police, he had Brown drive him toward Mitchell's home and then drop him off at the intersection of Munson Drive and Shelby Street, which was near Mitchell's home. The taxi company's policy required drivers to radio in when they dropped off a passenger. Brown radioed in after picking Mitchell up, but did not radio in again that night. Less than an hour later, Brown

was found slumped over in his taxi at the intersection of Munson Drive and Shelby Street, dead from a gunshot wound to the back of the head.

At trial, one of Mitchell's neighbors testified that at approximately 2:30 a.m., he saw a taxi sitting at the intersection of Munson Drive and Shelby Street, approached the taxi, and saw Brown slumped over in the front seat. Shortly thereafter, while he was standing outside his home, the neighbor saw an African-American man wearing a white shirt walk around the front of the taxi and then run away. The neighbor then called police.

When police arrived, they found Brown unresponsive with a gunshot wound to the head. The taxi was still running and the lights were still on. Police discovered gunpowder residue on the back of the hat that Brown was wearing and a shell casing underneath Brown's seat.

Based on call logs from the cab company, investigators determined that Brown's last pickup was at the Motel 6 and that the request for a taxi was made on behalf of a person from Room 234.

Police discovered that Room 234 was rented to Mitchell's friend, so they went to the Motel 6 and questioned him. The friend informed police that he had spent time with Mitchell earlier that night and told them where Mitchell lived. Police also questioned the Motel 6 employee who called the taxi for Mitchell, and he identified Mitchell from a photographic lineup as the man who requested the taxi.

Police arrived at Mitchell's home at 6:30 that morning. Mitchell was not home, but police spoke with his wife, who said that she had not seen Mitchell since 10:00 the night before. Police left but returned later that afternoon, and Mitchell's wife consented to a search of the property, which uncovered a .380 handgun under the air conditioning unit in the backyard, along with a rolled up white t-shirt and a black nylon cap. Later, ballistics and forensic testing confirmed that the handgun was the murder weapon, and that the cap matched fibers found in Brown's taxi. Police obtained a warrant for Mitchell's arrest, and Mitchell was later arrested at nearby Fort Benning.

After being advised of rights under *Miranda,*[2] Mitchell consented to a custodial interview in which he admitted to taking a taxi ride from the Motel 6 to the intersection of Munson Drive and Shelby Street, but he denied shooting Brown. He also claimed that he discovered that Brown had been shot when, after he was dropped off, he saw the taxi's lights from his backyard and walked back to the taxi to see why it was still there.[3] According to Mitchell, he then left and "snuck" onto Fort Benning with the help of a friend. When questioned about the gun found in his backyard, Mitchell said, "someone must have dropped it" there. But he admitted that he was wearing a white t-shirt and a nylon cap when he rode in Brown's taxi. In addition, Mitchell's stepbrother received a text message from Mitchell two days before the shooting stating that Mitchell wanted to rob someone.

Mitchell does not challenge the sufficiency of the evidence.

---

[2] *Miranda v. Arizona,* 384 U.S. 436, 479 (86 SCt 1602, 16 LE2d 694) (1966).

[3] Police later determined that it was impossible to see the location of the vehicle from Mitchell's backyard.

Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find beyond a reasonable doubt that Mitchell was guilty of the crimes for which he was convicted. See *Jackson v. Virginia,* 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Mitchell argues that his trial counsel was constitutionally ineffective for (a) failing to object to certain testimony Detective Amanda Hogan offered on behalf of the State, on the theory that it was improper expert opinion testimony and (b) failing to object or move for a mistrial, on *Brady* grounds, because of other testimony Detective Hogan offered at trial.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355,

6

356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. This requires a defendant to overcome the "strong presumption" that trial counsel's performance was adequate. *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation and punctuation omitted). To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010). We conclude that Mitchell has failed to show that any of his trial

7

counsel's alleged failures were deficient.

(a) *Expert Opinion Testimony*.

Mitchell's first claim stems from Detective Hogan's testimony about the crime scene, and specifically that there was gunpowder residue on Brown's hat; that the gunshot "was at a close range inside the vehicle"; and that the bullet entered the back of Brown's head and exited from his left eye. She also testified about how and in which direction the gunshot casing would have been ejected from the gun, and about the location in the vehicle where that casing was found. According to Mitchell, Detective Hogan provided expert ballistic, forensic, and firearm testimony outside the ken of the average juror, thus requiring the State to lay a foundation for Detective Hogan's expertise in those areas — yet the State failed to lay the requisite foundation.

Mitchell acknowledges that his trial counsel objected to the complained-of testimony, but contends that his trial counsel merely voiced a generalized objection and that he was ineffective for failing to object specifically that Detective Hogan's testimony was

"improper expert testimony." But a closer review of the transcript reveals that trial counsel *did* object on the grounds that Mitchell urges on appeal, and, as a result, counsel was not deficient in this respect.

Indeed, when the State asked Detective Hogan, "from your experience where do you think that the shot came from that — that killed Mr. Brown?" defense counsel said "I object. I'm not sure she would be qualified. That would be a ballistics question I would think." The trial court then asked whether the prosecutor could "lay a foundation." As the prosecutor sought to do so, Detective Hogan's answers veered back into what she observed in this case, and defense counsel objected again because "[t]his isn't laying a foundation anymore." The Court agreed, directing the prosecutor to "[i]nquire of the witness's experience and training in the area that you're examining." Despite the prosecutor's effort to do so, Detective Hogan again turned to the facts of this case, prompting defense counsel to complain, "again, we're back now to testifying about this case. I think if we could voir dire expertise, not — not to elicit facts

about this particular matter."

The trial court then held a sidebar with the attorneys, telling the prosecutor, "what I wanted you to do was voir dire her on her expertise and — as a foundation for her giving an opinion, not have her testify to what you had prepared her to testify until she is accepted as an expert in that area." The prosecutor responded:

> I don't think it takes an expert to say from whence a bullet comes. . . . [S]he can say from her experience, it looks like it came from the inside. . . . I wasn't going to get into any questions about ballistics, any questions about stippling or soot or any of that. . . . [S]he said that she saw the gunshot to the back of his head and he was slumped down.

The Court opined, "That's an observation. And did she also say she saw — saw soot, soot from the gun?" To this, the prosecutor replied:

> Yeah. . . . And I said from — from your training and experience where do you think the bullet came from. . . . The GBI expert wasn't at the scene. All I'm — all I'm trying to get from the witness is what she thought that the — the bullet came from. . . . I think it — she can use her common sense.

The Court asked, "So she's not being offered as an expert?" And

the prosecutor replied, "No." The court then permitted the State to "inquire about her observations," and defense counsel seemed to concede by commenting, "I guess just as long as it's not a conclusion that an expert would have to make."

When the State continued its direct examination of Detective Hogan, she testified that she personally observed gunpowder residue on Brown's hat and a shell casing under his seat. The State then asked, "And from — from seeing where the — the shot entered the body and where it exited and where you found the casing, what — what did that indicate to you?" Detective Hogan responded, "That it was at a close range inside the vehicle." Defense counsel objected yet again, complaining, "[t]hat's specifically the type of question I'm not sure she would be qualified to answer," and the court overruled counsel's objection.

Under OCGA § 24-1-103 (a) (1), valid evidentiary objections must "stat[e] the specific ground of objection, if the specific ground [is] not apparent from the context." Contrary to Mitchell's arguments on appeal, however, the record shows that trial counsel

11

*did* articulate specific grounds for his objections to Detective Hogan's testimony. Indeed, trial counsel specifically objected that Detective Hogan was not "qualified" to answer ballistics questions; that the State was not properly "laying a foundation"; that it was necessary to "voir dire [the] expertise" of Detective Hogan; that Detective Hogan could not provide "a conclusion that an expert would have to make"; and that Detective Hogan was not "qualified to answer" questions about what the gunshot entry and exit wounds indicated. Trial counsel was not required to use the specific phrase "improper expert testimony" — which seems to be Mitchell's contention on appeal — to lodge a specific objection on that ground. See *Harvey v. State*, 344 Ga. App. 7, 10 (806 SE2d 302) (2017) ("[M]agic words are not needed to make a proper objection" that "articulate[s a party's] concern with sufficient specificity to inform the trial judge of the alleged error when objecting."). Because Mitchell's trial counsel objected on the very grounds that Mitchell now contends trial counsel failed to assert — and because Mitchell obtained a ruling from the trial court on that objection — Mitchell

"cannot establish that his trial counsel was deficient" as to this claim. *Ellis v. State*, 287 Ga. 170, 172 (695 SE2d 35) (2010) (citation and punctuation omitted); see also *Franklin v. State*, 306 Ga. 872, 876 n.10 (834 SE2d 53) (2019) (ineffectiveness claim based on alleged failure to make particular objection meritless because record showed counsel did make that objection); *Slaton v. State*, 303 Ga. 651, 654 (814 SE2d 344) (2018) (same).

(b)   *Brady Violation.*

Mitchell also contends that during Detective Hogan's testimony, the defense first learned that 10 fingerprints recovered from Brown's taxi were "of great value," and also first learned of the identity of the fingerprint examiner.   According to Mitchell, the State's failure to produce this evidence prior to trial constituted a *Brady* violation: a "suppression by the prosecution of evidence favorable to an accused upon request" that "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.   He thus argues that his trial counsel's failure to

13

object to, or move for, a mistrial on this basis constituted ineffective assistance. But because we conclude that Mitchell has failed to establish a *Brady* violation as a threshold matter, he also has not shown that his trial counsel was constitutionally deficient.

During the State's direct examination of Detective Hogan, she testified about a report that was furnished to the defense concluding that over 60 fingerprints "of value" had been recovered from Brown's taxi. Detective Hogan also testified that "once [the examiner] broke it down and went through the 64, he was able to determine that only ten were of great value that had enough ridges that could be put into the system." This prompted trial counsel to approach the bench, where he objected that he had not been made aware that an examiner had identified these 10 fingerprints as having "great value," and that he would "like to know" if those fingerprints matched Mitchell, if they "matched anyone else," and who examined the prints because he "might like to subpoena them and have them come in and testify." Specifically, trial counsel advised the court that these 10 "great value" fingerprints were not mentioned in the

report that he was furnished and he had not previously heard about them, despite having asked the prosecution, prior to trial, whether there were any additional reports. The trial court excused the jury so that Detective Hogan could be questioned further about the issue outside of the jurors' presence. During this questioning, Detective Hogan stated that she had just learned "[y]esterday afternoon," when she "double-checked" with a law enforcement database, that the 10 fingerprints had been identified as "ones that could have resulted in any kind of match or a hit," but that even for those, "there was no match in the system," and no additional report was prepared. She also stated that "Corporal Godfrey" is "the one that actually reads the prints." After Detective Hogan provided that explanation, trial counsel stated that he had "no problem with the State going into further questions on that topic," the jury returned, and Detective Hogan's direct examination resumed; she went on to testify that "there [were] many [fingerprints] found in the taxi," but "none were identifiable . . . [t]o . . . any person."

To establish a *Brady* violation, a defendant must show that:

15

(1) the State, including any part of the prosecution team, possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed to the defense.

*Anthony v. State*, 302 Ga. 546, 552 (807 SE2d 891) (2017) (quoting *State v. James*, 292 Ga. 440, 441 (738 SE2d 601) (2013)). Pretermitting whether the first three factors are present here, Mitchell has failed to establish the fourth prong: that "a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed." Id. (citation and punctuation omitted).

Here, Mitchell argues that had he been provided with information about the 10 "great value" fingerprints and the identity of the fingerprint examiner, Mitchell could have conducted independent tests. He further argues that if those tests showed that the 10 "great value" fingerprints matched other people (or, at least, that they did not match Mitchell), that would have enabled the

defense to present evidence that Mitchell was not the only person recently in Brown's taxi; to argue that Mitchell had not been in Brown's taxi at all; or to impeach the State's law enforcement witnesses by showing that its investigation was deficient. But "'[t]he mere possibility that an item of undisclosed information might have helped the defense'" is not enough to establish the fourth *Brady* factor. *Upton v. Parks*, 284 Ga. 254, 256 (664 SE2d 196) (2008) (quoting *United States v. Agurs*, 427 U.S. 97, 109-110 (96 SCt 2392, 49 LE2d 342) (1976)). Because Mitchell presents no evidence in support of his speculation and conjecture about how the allegedly undisclosed evidence would have been favorable to him, he fails to establish a reasonable probability that the outcome of his trial would have been different had any such evidence been disclosed. See id. at 255-256 (State's failure to disclose a GBI ballistics report showing a match between crime-scene shell casings and ballistics casings from an unsolved crime and its reference in a report to an unknown witness did not support *Brady* claim because defendant's argument about what exculpatory evidence he may have been able to uncover

17

had he had the report was "purely speculative"); *Walker v. State*, 264 Ga. 79, 81 (440 SE2d 637) (1994) (no *Brady* violation where undisclosed witness statement contained only "speculations to the police that some unnamed person (presumably other than appellant) was the perpetrator of the crimes"). Moreover, any such evidence would be unlikely to change the outcome of Mitchell's trial because the jury already heard Detective Hogan agree, as part of her trial testimony, that none of the fingerprints found in Brown's taxi were matched to "any person," and the jury reasonably could infer that included Mitchell.

Because Mitchell has failed to establish the fourth *Brady* factor, he cannot establish that trial counsel's failure to assert a *Brady* violation was constitutionally deficient. See *Jackson v. State*, 306 Ga. 69, 89 (829 SE2d 142) (2019) (because *Brady* claim failed, ineffectiveness claim based thereon also failed).

3. Mitchell contends that the trial court erred (a) by failing to prevent Detective Hogan from testifying about the 10 "great value" fingerprints because of the alleged *Brady* violation described in

18

Division 2 (b), and by failing to declare, sua sponte, a mistrial to remedy that alleged *Brady* violation; and (b) by admitting into evidence an autopsy photograph that Mitchell argues is gruesome and unduly prejudicial.

(a) *Brady Violation.*

For the reasons explained above in Division 2 (b), Mitchell has failed to establish a *Brady* violation. Accordingly, his enumeration of error based on the trial court's alleged failure to remedy that violation, either by excluding the evidence or by declaring a mistrial, also fails.

(b) *Autopsy Photograph.*

Mitchell contends that a gruesome autopsy photograph, which showed Brown's head with the scalp cut open and skin peeled back to reveal the gunshot wound on Brown's skull, should not have been admitted at trial. Mitchell argues that under the exclusionary rule announced by this Court in *Brown v. State*, 250 Ga. 862, 867 (302

19

SE2d 347) (1983),[4] the trial court committed reversible error by admitting the photograph into evidence. But we have "disavow[ed]" — and reiterated the disavowal of — "the application of the rule announced in *Brown*, and applied in its progeny, in cases governed by the new Evidence Code." *Venturino v. State*, 306 Ga. 391, 396 (830 SE2d 110) (2019); see also *Flowers v. State*, 307 Ga. 618, 623 (837 SE2d 824) (2020); *Bentley v. State*, 307 Ga. 1, 4-5 (834 SE2d 549) (2019). Under our current Evidence Code, we generally evaluate the admissibility of autopsy photographs under OCGA §§ 24-4-401, 24-4-402, and 24-4-403 ("Rules 401, 402, and 403"), relying on "our cases decided under the new Evidence Code, and also look[ing] to federal case law for guidance." *Venturino*, 306 Ga. at 396.

Rule 401 defines "relevant evidence" broadly, *State v. Orr*, 305 Ga. 729, 736 (827 SE2d 892) (2019), because it is defined as

---

[4] In *Brown*, this Court announced a rule that "[a] photograph which depicts the victim after autopsy incisions are made or after the state of the body is changed by authorities or the pathologist will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy." 250 Ga. at 867.

"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. And Rule 402 provides: "All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending. Evidence which is not relevant shall not be admissible." OCGA § 24-4-402. Under Rule 403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403. "Decisions regarding relevance are committed to the sound discretion of the trial court, and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." *Venturino*, 306 Ga. at 395 (citations and punctuation omitted).

Here, the medical examiner testified that the photograph at issue "help[ed] explain the direction of the gunshot wound . . . in further detail," and that because "one of the wounds involved the eyeball," it could be "challenging, especially in this case" to get the same perspective of the wound without Brown's skin being pulled back. And when asked, "Is it necessary in your presentation of the evidence?" the medical examiner responded, "Yes. It's — it's necessary for me to explain the direction in a — in a photograph." The trial court then admitted the photograph, finding that although the photograph was "unpleasant" to view, the trajectory of the gunshot could be better explained with the use of the photograph.

Given the medical examiner's testimony, the trial court did not abuse its discretion when it concluded that the autopsy photograph was relevant under Rule 401's broad definition. See, e.g., *Pike v. State*, 302 Ga. 795, 799-800 (809 SE2d 756) (2018) ("The challenged photographs . . . were relevant to show the nature and location of the victim's injuries, which corroborated the State's evidence of the circumstances of the killing."); *Moss v. State*, 298 Ga. 613, 617-618

(783 SE2d 652) (2016) ("The photos and related testimony were relevant to show the nature and location of the victim's injuries, which corroborated the account of the shooting given by . . . eyewitnesses."). Even though the trial court concluded that the photograph was "unpleasant . . . to look at," it also concluded that the medical examiner "said that his explanation of the trajectory and direction of — of the gunshot can be better explained by him through the use of the photograph" and admitted the photograph into evidence on that basis. Given these findings, we cannot say that the trial court abused its direction by admitting into evidence the autopsy photograph at issue here. See, e.g., *Flowers*, 307 Ga. at __ (reasoning that in admitting an autopsy photograph "showing the underside of Flowers's brain, to illustrate the extent of the bruising," the trial court "did not abuse its discretion in deciding that the photograph's probative value was not substantially outweighed by the danger of unfair prejudice"); *Venturino*, 306 Ga. at 396 (reasoning that "[a]lthough the photograph was relatively gruesome, the record shows that it depicted the 'only way' the medical

23

examiner could . . . 'accurately' show the precise path that the bullets travelled through [the victim's] body" and concluding that "the trial court did not abuse its discretion when it ruled that the photograph was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice").[5]  Mitchell's enumeration therefore fails.

*Judgment affirmed.  All the Justices concur.*

---

[5] In support of his contention that the prejudicial impact of the autopsy photograph outweighed its probative value, Mitchell notes that one of the jurors — who stated that he had been shot in the head while serving in the Army — informed the trial court, "I'm having bad nightmares from seeing [the autopsy photographs] and what happened to me in the service." But a review of the record on appeal shows that this difficulty was unique to this particular juror; the juror did not complain about the specific photograph at issue on appeal; and the trial court excused the juror "in the interest of . . . justice and also . . . in consideration to the juror's experience and what the evidence in the trial is causing him to re-experience."  Considering the record as a whole, we cannot say that the trial court abused its discretion in conducting its analysis of the autopsy photograph at issue.

DECIDED FEBRUARY 10, 2020.
Murder. Muscogee Superior Court. Before Judge Smith,

*David S. West*, for appellant.

*Julia F. Slater, District Attorney, Alonza Whitaker, Benjamin E. Gephardt, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.