2021 UT App 39

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
THORPE STEELE,
Appellant.

Opinion
No. 20190441-CA
Filed April 8, 2021

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 171910312

Emily Adams, Freyja Johnson, and Cherise M.
Bacalski, Attorneys for Appellant

Sean D. Reyes and David A. Simpson, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion,
in which JUDGE MICHELE M. CHRISTIANSEN FORSTER and
SENIOR JUDGE KATE APPLEBY concurred.[1]

MORTENSEN, Judge:

¶1     Thorpe Steele does not deny he had sex with his trainee, Emma.[2] Instead, he claims their sexual attraction was so significant that within thirty minutes of meeting, the two engaged in passionate sexual activity, during business hours, in the sleeper compartment of a semi-truck parked in their employer's parking lot. And he claims that they pledged to continue to do so daily for

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

2. We employ the pseudonym Emma to protect her privacy.

the next month. But within minutes after Steele left the truck, Emma, sobbing and hysterical, reported that she had been raped. Charges and a trial followed, and Steele now appeals his convictions for rape and forcible sodomy. He generally contends that his attorneys provided ineffective assistance based on the way they handled evidence of Emma's sexual orientation. We affirm.

BACKGROUND[3]

¶2 Emma owned a farm where she and her wife (Wife) raised sheep. Emma decided to get a commercial driver license so that she could haul hay and livestock for her farm. To that end, she signed up with a trucking company (the Company) that offered a commercial driver license program. The program included on-the-job training, which required each trainee to drive a truck on a long-haul trip under the supervision of an experienced trucker. The Company assigned Emma to drive under Steele's supervision, meaning that Emma and Steele would be driving his truck together for approximately twenty-eight days. Wife dropped Emma off at the Company's headquarters on the morning that the long-haul trip was supposed to begin. Emma was both nervous and excited about making her first long-haul trip, and she expressed her intention to call Wife every day and night while she was away.

¶3 Emma and Steele met for the first time that day. Steele was about thirty years older than Emma, nearly one foot taller, outweighed her by close to sixty pounds, and was missing half his front teeth. After introducing herself, Emma loaded her bags into

---

3. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Cruz*, 2020 UT App 157, n.1, 478 P.3d 631 (cleaned up).

Steele's truck. When Emma, who was wearing shorts, bent over to pick up one of her belongings, Steele remarked, "Oh, you shave. That's good because the last girl didn't." Steele followed this by saying, "what happens in the truck stays in the truck." Steele then showed her around the truck, eventually leading her into the sleeper cab—a compartment of the truck cabin with a bunk bed and television. Steele showed Emma a knife and mentioned that two others were placed throughout the sleeper cab.

¶4 Steele sat on the bottom bunk bed while Emma tried to get her bearings in the sleeper cab. Suddenly, he grabbed her as she was trying to figure out how to operate the television, thrust one of his hands down her shorts and underwear, and pushed them down to her ankles. Emma told Steele to stop. Instead, he put his hand up her shirt and grabbed her breasts, telling Emma to undress. When Emma again told him, "[N]o," Steele responded, "[N]o is not an option," and threatened to hurt her if she did not comply. Emma felt hopeless, as though "there was nothing [she] could do" while Steele pushed her aside to close the curtains and lock the doors. Emma ended up face down on the bed, and Steele tried to pry her legs open while grabbing her ponytail and biting her shoulder. Steele was eventually able to insert his penis into Emma's vagina, demanding that she say it "felt good" and that she "wanted it." Steele eventually flipped Emma onto her back and put his penis into her mouth. When Steele finished, he told Emma to "forget about [her] family" because she was "going to be his whore for the next month," and he repeated, "what happens in the truck stays in the truck." Steele then left to take a shower.

¶5 Emma fled the truck in a panic. She yelled for help, but no one else was close enough to hear, so she used her phone to call one of her former trainers. Emma was "[t]remendously [in] tears" on the phone and, in the trainer's own words, "[I]t took everything I had to get her to calm down on the phone to find out

what was going on." When the trainer discerned that she needed help, he told her to find a safe place to hide while he called for help.

¶6     Emma hid in a bathroom until an employee found her and escorted her to the human resources office. There, an employee in that department observed that Emma "came in crying" and, after the employee ushered her into another room, she sat on the floor and "cr[ied] the whole time." Concerned by her observations of Emma, the employee pointedly asked Emma if she had been raped. Emma managed to say, "[Y]es," before crumpling to the floor and crying uncontrollably. When a police officer arrived shortly thereafter, Emma was "very visually shaken up." Emma was crying the entire time the officer tried to ascertain what had happened, but eventually she told him that her "trainer driver" had raped her. Wife arrived soon after and likewise observed Emma "sitting in the fetal position on the floor, rocking[,] . . . crying, really shook up."

¶7     At that point, the officer told Wife, "We really need to take [Emma] over to the hospital to have the examination done." Wife drove Emma to the hospital, where a sexual assault nurse examiner proceeded to examine her. Emma was "very tearful" and "had to stop several times to collect . . . and compose herself," but she was able to tell the nurse what had happened. During the examination, the nurse specifically found fresh "linear abrasions" that "matched [Emma's] narrative" that Steele had bitten her shoulder. The nurse concluded that, based on the totality of the examination, Emma's injuries were medically consistent with her description of the rape.

¶8     When Steele spoke with police, he claimed that what happened in the truck—which took place approximately thirty minutes after the two met for the first time—was a consensual encounter. According to Steele, when he first met Emma, he told her she "was cute" and "had nice eyes." He further claimed that

when they were in the sleeper cab, they stared into one another's eyes before "lean[ing] in" and kissing. Emma, Steele said, then "made some movements towards him," which initiated the sexual encounter. Steele said he told Emma, "You don't have to do this, this isn't part of the job," to which she replied, "It's not like I'm stopping you." Steele claimed that he then put his hand around her backside and started to remove her shorts, the two stripped naked and closed the curtains together, and then Emma pushed Steele onto the bed. She eventually got on top of Steele and the two had intercourse while Emma told Steele where and how to touch her. Steele's version of the sexual encounter concluded by Emma performing oral sex on him.

¶9     Steele continued to offer more details about what he alleged occurred after that, claiming Emma caressed his face while the two cuddled. And when Steele told her that he "didn't feel like maybe he had performed up to his level because it had been so long since he'd been with a woman," Emma supposedly assured him "that it was going to be okay [and] that they would work on it together for the next 28 days." According to Steele, the two were "happy" and joked around, and they eventually agreed they would not tell their wives about anything that happened in the truck. The two also agreed to shower and return to the truck to begin what Steele apparently believed was going to be twenty-eight days of non-stop consensual sex with his trainee. When the officer asked Steele why, if any of that had occurred, Emma would fabricate a rape accusation, Steele speculated that maybe she "was worried that her wife had found out." Police arrested Steele, and the State charged him with rape and forcible sodomy.

*Rule 412 Motion and Pretrial Objections*

¶10    In later investigations, Steele claimed that Emma had told him she was bisexual and had not been "with a man" for several years. In response, the State filed a motion in limine (the rule 412 motion) to preclude any references to these statements at trial

under rule 412 of the Utah Rules of Evidence—which provides that, absent a specific exception, "evidence offered to prove that a victim engaged in other sexual behavior . . . [or] to prove a victim's sexual predisposition" is "not admissible." Utah R. Evid. 412(a).

¶11    Steele's trial attorneys (Counsel)[4] filed a response in which they stipulated that Steele "ha[d] no objection to the State's motion to exclude statements that [Emma] made" that "she was bisexual" and that "she had not been 'with a man' for a number of years." But Counsel would not "agree to a blanket exclusion of all possible future 412 evidence" and specifically "reserve[d] the right to file a motion to include 412 evidence in trial should any evidence arise from" results of ongoing physical evidence tests.

¶12    The court held a hearing a few weeks before the trial to discuss several outstanding motions.[5] Regarding the rule 412 motion, the court stated its understanding of the stipulation was "that really [Counsel] just said they wanted to keep some options open, but other than that they were not contesting the specific" statements referenced in the motion. Counsel agreed and explained that they would "only be bringing up 412 information if it's opened by the alleged victim in the case, if she starts

---

4. Two defense attorneys represented Steele at trial. We refer to them collectively as "Counsel" and use the pronoun "they" for ease of reading.

5. The most pressing matter appears to have been Steele's objections, pursuant to rule 404(b) of the Utah Rules of Evidence, to the State presenting testimony from two witnesses who claimed that Steele had also sexually assaulted them. The State argued that these instances were highly probative of Steele's intent, asserting that "he set our victim up the exact same way that he set up these other women to be assaulted" by "purposely isolat[ing]" and threatening her. Counsel successfully prevented the State from introducing this evidence at trial.

mentioning her sexuality or why she wouldn't engage in sexual acts with a man or things like that."

¶13 Just before jury selection, the court and the attorneys engaged in "a lengthy conversation about what the parties had stipulated to, how the parties would present their cases, and what evidence should come in." Among many other things, Counsel indicated that they believed the State would call Wife as a witness to "bring up that . . . the alleged victim, is a lesbian, is married to a woman." And when the State responded that it did not intend to "ask [Wife] about their sexual activity," Counsel maintained that calling Wife and introducing the fact that she was married to Emma would, nevertheless, suggest to the jury that Emma was a lesbian, and would thus "open the door" for Steele to introduce evidence that Emma was bisexual. Counsel made numerous arguments in support of this contention, including, for example:

> I think the prejudice weighs greatly on my client that he would be sleeping with a self-proclaimed lesbian, if she—and make him seem more of an aggressive person if the truth did not come out that she also sleeps with men.
>
> . . .
>
> Well, Your Honor, I think it's actually prejudicial to my client and does not allow for a fair trial if the alleged victim says she is a lesbian and will not sleep with men, and my client is an older man in a position of power and is able to have sexual intercourse that he says is consensual with a lesbian, I think the jury is going to be more inclined to believe her because she has a specific sexual orientation. If she's bisexual, I think it's more fair to my client. She mentioned that to him. She mentioned that to the officers. That shows that it could be a consensual activity. I think that's

> important if they are going to bring up her sexual
> orientation that would exclude that possibility of
> consensual sex.
>
> . . .
>
> You have someone who has a specific sexual
> orientation, and for them to engage with somebody
> else, that already shifts—casts suspicion on my
> client. It casts doubt that she would ever engage in
> that consensually.

¶14    Counsel also asserted that they understood the stipulation to the rule 412 motion was that neither side would introduce *any* evidence of Emma's sexual orientation, and thus they argued that the State would be violating the stipulation by introducing evidence of Emma's marriage. In other words, Counsel interpreted the stipulation as being an "all encompassing" "protection of [Emma's] sexual orientation. So, there wouldn't be any mentioning of her sexual orientation" at all. Counsel thus clarified that their argument was "on two fronts. One, . . . [Emma's] marriage] opens the door. And, secondly, we have a stipulation that [Emma's marriage] would not come in."

¶15    The court "overruled" Counsel's first argument on the merits, explaining that merely calling Wife as a witness and introducing her as Emma's wife would not open the door to introducing evidence of Emma's sexuality. Specifically, the court ruled:

> The objection will be overruled as far as the 412. I
> surely—if she gets up and says something to the
> effect that I would never sleep with a man, that may
> very well open the door and we'll address it
> differently. But as far as just the fact that she's
> married to a woman, that in and of itself, seems to
> me not to open the door to anything.

¶16 But the court expressed "concern" about the "idea that there was a stipulation." Although the court "thought the stipulation was . . . generally about the statements about having been with a man," it invited more arguments from the attorneys about the stipulation's contours. The State asserted that the "agreement with the [d]efense ha[d] not changed at all" because it intended to call Wife only as a "witness, factually, in this case" and was "not going to talk about their sexual activity or previous sexual activity." The State noted that "if the [c]ourt is concerned in any way," Wife could be referred to as an acquaintance rather than as Emma's spouse. Counsel, on the other hand, reiterated that the stipulation was all-encompassing, and specifically stated:

> Your Honor, I don't think there's a way that the State could put on [Wife] without showing that she is the spouse of [Emma].

¶17 After hearing these arguments, the court asked the State to specifically explain the relevance of Wife's testimony. When the State answered that Wife would be testifying to "her observations of [Emma]," the court followed up by asking, "[A]nd why does that matter?" When the State explained that Wife would testify as to Emma's emotional state both before and after the incident, as well as testifying to Wife's own observations of Emma on the day of the incident, the court again followed up, asking, "[M]eaning what?" The State answered that Emma was still "afraid to be alone" and "has been very much affected by" the incident. Counsel responded to these explanations by asking for Wife to be prevented from testifying altogether:

> Your Honor, I believe all of these statements would be hearsay, these statements could come through [Emma]. We have other witnesses that are at [the Company's headquarters] from this event [when] the sexual encounter occurred. And they can testify to their observations of [Emma]. She immediately

speaks to officers, to HR, to the [sexual assault nurse examiner]. I don't—a lot of the statements would just be hearsay. And they are not necessary for the elements charged. So I would *ask to strike this witness*.

(Emphasis added.)

¶18 The court immediately issued a ruling, striking a balance by declining to prevent Wife from testifying altogether, but—consistent with Counsel's representations of the scope of the rule 412 stipulation—not allowing Wife to be introduced as Emma's spouse and instead requiring that she "testify as an acquaintance, even a close acquaintance." In other relevant part, the court explained:

> I will grant the motion as far as admitting any evidence of sexual orientation. Frankly, I usually would not. Whether someone is married to the person of the same gender seems to be not relevant for the most part. I am concerned that [Counsel's] understanding was that it would not be admitted at all. And because of that misunderstanding, I'm going to hold the State to what was the claimed agreement. . . . I will accept [Counsel's] representation that [they] understood that to be the agreement that sexual orientation would not be admitted at all.
>
> As far as the witness itself, it seems to me that the witness can testify about exactly what [the State] is saying, and that is that she dropped her off; that her appearance, demeanor when she was dropped off to the trucking company, the fact that she called and reported whatever—although those statements are hearsay and the foundation for those statements need[s] to be established before they can come in,

but the very—*But I'm just ruling on the objection*, and that is that *because they come from the person that is her spouse, that they would be objectionable on that ground, and I will overrule that. . . . Again, I'm just ruling on the witnesses testifying*, not whether or not the underlying evidence is otherwise objectionable as hearsay, or for whatever—whatever other reason.

(Emphasis added.)

¶19    Counsel responded that they "still [had] a problem with that" because allowing Wife to testify as a close acquaintance was "just hiding [the issue] and confusing the jury." Specifically, Counsel explained their "fear" that the jury would hear the evidence, including Wife's continual factual involvement in the case, and "put the dots together" that Wife was indeed married to Emma. Counsel also indicated that they were concerned that Wife would be able to testify and corroborate Emma's testimony, yet Counsel could not impeach her on the fact that the two were married, which "automatically goes to the credibility and the potential for lying."

¶20    The court responded, "Well, so you tell me which way you want this because you can't have it both. Either she is—she testifies, but doesn't say she's a spouse, or that she says she's a spouse." Counsel asked for some time to contemplate how to handle Wife's testimony and proposed that the issue be postponed until Wife was set to testify. The court asked how, if the issue were put off until then, the parties would deal with referring to Wife during opening arguments. As the parties discussed how this would work, such as by referring to Wife generically as "a witness," the court suddenly interjected with the following:

> Let me help you out. This is going to be far too confusing. The objection to her sexual orientation will be overruled. You can bring [her in] as a spouse

and testify to that. She will not testify about whether
or not—evidence of her being bisexual or whether
or not she was with a man. . . . I will, of course, allow
if there is a door that has been opened during the
proceeding, then we'll rule otherwise.

*The Trial*

¶21    Steele's defense did not preclude the possibility that Emma
consented to having sex with him because she was "carried away
in the moment," but Counsel also advanced a specific theory that
Steele was essentially collateral damage in a scheme Emma and
Wife devised before the long-haul trip. This theory relied on the
fact that the Company's program included "a nine-month
noncompete contract, as well as a $5,000 tuition payment," both
of which Emma "g[ot] out of" in exchange for agreeing not to sue
the Company. This theory thus offered an explanation as to why,
if the version of events Steele relayed to police were true, Emma
would immediately claim she had been raped.

¶22    Wife testified consistently with the court's final ruling
regarding her testimony: she was introduced as Emma's spouse
and testified about her observations of Emma before, on the day
of, and after the incident. Counsel asked Wife several questions
about her potential personal and financial motives to aid in
fabricating the rape and then suggested that Wife *did* fabricate
what had occurred, after the fact, when she "compared notes"
with Emma and thus ordered the events to fit their narrative.

¶23    After hearing the evidence, the jury convicted Steele of
rape and forcible sodomy. The parties concede on appeal that
neither the State nor any witness stated that Emma would not
have consented to sexual intercourse with Steele because she
would not consent to having sex with a man. As a result, the
evidence regarding Emma's alleged bisexuality was never
introduced at trial. Steele now appeals.

ISSUES AND STANDARD OF REVIEW

¶24  Steele contends that Counsel provided ineffective assistance based on numerous alleged failures in handling the evidence of Emma's sexual orientation. He contends that Counsel was ineffective for: (1) stipulating to the rule 412 motion without a purportedly necessary caveat; (2) failing to argue that evidence of Emma's marriage should have been excluded under rule 403 of the Utah Rules of Evidence; and (3) objecting to the court's "favorable ruling" that required Wife to be referred to as an acquaintance. Each claim "presents a question of law," having all been "raised for the first time on appeal." *State v. Cruz*, 2020 UT App 157, ¶ 15, 478 P.3d 631 (cleaned up).

ANALYSIS

¶25  To prevail on any of his claims, Steele must show that Counsel's "performance was deficient" and that "the deficient performance prejudiced the defense." *State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350 (cleaned up). Steele's "inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (cleaned up).

¶26  To show that Counsel's performance was deficient, Steele must demonstrate that their acts or omissions "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 28 (cleaned up). So, if it appears that Counsel's chosen course of conduct "could have been intended to further a reasonable strategy," Steele cannot show deficient performance. *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. But even if a reasonable strategy cannot be discerned, Steele must still demonstrate that Counsel's acts or omissions were objectively unreasonable in light of the relevant contextual circumstances. *See id.* ¶ 36.

¶27    To show that Counsel's acts or omissions were prejudicial, Steele must "demonstrate a reasonable probability that the outcome of his . . . case would have been different absent [Counsel's] error." *Scott*, 2020 UT 13, ¶ 43. And by "reasonable probability," we mean "a probability sufficient to undermine confidence in the outcome." *Id.* (cleaned up).

## I. Stipulation to the Rule 412 Motion

¶28    Steele first contends that Counsel provided ineffective assistance by stipulating to the rule 412 motion without including a caveat that, if the State first offered evidence of her sexuality, then he could introduce evidence of Emma's bisexuality under rule 412(b)(3) of the Utah Rules of Evidence. *See* Utah R. Evid. 412(b)(3) (providing an exception to the general rule barring evidence offered to prove a victim's sexual predisposition if exclusion of the evidence "would violate the defendant's constitutional rights"). In other words, Steele concedes that evidence of Emma's bisexuality presumptively fell within rule 412(a)'s general exclusion, but he asserts that the evidence should have been admitted under rule 412(b)(3) to "rebut the presumption of nonconsent" raised by admitting evidence that Emma was married to a woman. Steele thus asserts the evidence would have been admitted under rule 412(b)(3) if Counsel had included this caveat in the stipulation to the rule 412 motion.

¶29    Even if we assume Counsel was constitutionally required to include a rule 412(b)(3) caveat in the stipulation to the rule 412 motion, Steele has failed to demonstrate that this omission resulted in prejudice. Steele's argument amounts to asserting that, but for Counsel's failure to include a rule 412(b)(3) caveat, evidence of Emma's bisexuality would have been admitted to confront the evidence that Emma was married to a woman and the inference therefrom that she would not have consented to sex with a man. But Steele ignores the fact that the court heard his rule 412(b)(3) argument during the pretrial discussion and rejected it

on its merits. Specifically, the court opined that rule 412(b)(3) likely would be implicated if there was any argument at trial that Emma would not have consented to having sex with a man, stating that it would "rule otherwise" if something to that effect happened during trial. But the court ultimately ruled that the mere fact that Emma was married to a woman was "not relevant" and did not "open the door to anything" under rule 412(b)(3). *See supra* ¶¶ 15, 18, 20. In other words, the court did not rule that evidence of Emma's bisexuality could not come in *because* Counsel did not include a rule 412(b)(3) caveat in its stipulation, but instead ruled that the evidence simply did not satisfy rule 412(b)(3)'s "high bar," *see State v. Thornton*, 2017 UT 9, ¶ 77, 391 P.3d 1016, and Steele has not challenged this ruling on appeal. Steele thus cannot show prejudice, because the court's ruling on the merits belies any "reasonable probability" that it would have received the evidence if Counsel included a rule 412(b)(3) caveat in the stipulation. *See State v. Edgar*, 2017 UT App 54, ¶ 17, 397 P.3d 656 (explaining that the defendant could not demonstrate prejudice from counsel's failure to raise an objection because he failed to show "a reasonable probability" that the objection would have been sustained). Accordingly, we reject Steele's first ineffective assistance claim.

## II. Rule 403

¶30 Steele next contends that Counsel performed deficiently by not "specifically" arguing that evidence of Emma's marriage should have been excluded under rule 403 of the Utah Rules of Evidence. *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). He argues that the evidence would have been excluded under rule 403 because any "negligible probative value" was outweighed by its "unduly prejudicial" nature, inasmuch as the case centered on consent and "the jury hearing that [Emma] was married to a woman made it much less likely that she would consent to hav[ing] sex with a man."

¶31    But on the record, it is apparent that Counsel did substantively object under rule 403 to admitting evidence of Emma's marriage. As to the danger of unfair prejudice, Counsel repeatedly argued that the evidence was prejudicial in the exact terms Steele argues on appeal—indeed, Steele goes so far as to explain why the evidence was unfairly prejudicial by directly quoting arguments Counsel made to the district court. *See supra* ¶ 13. Counsel also argued that the probative value of Wife's testimony was so low that the court should exclude her from testifying altogether because her testimony would largely be hearsay, the permissible content of her testimony could come through other witnesses, and her testimony was "not necessary for the elements charged." *See supra* ¶ 17.

¶32    And the court appears to have substantively engaged in the requisite rule 403 balancing. It asked several pointed questions about the probative value of Wife's testimony—for example, asking for clarification about why her testimony "matter[ed]." *See supra* ¶ 17. The court later resolved that Wife's testimony had enough probative value to allow her to testify and accordingly denied Counsel's request that she be stricken as a witness. *See supra* ¶ 18. And this came in the same ruling in which the court attempted to mitigate the danger of unfair prejudice of Wife's testimony—albeit couching it in terms of Counsel's understanding of the scope of the rule 412 stipulation—by requiring that she be introduced only as Emma's "acquaintance," not as her spouse. *See State v. Wright*, 2021 UT App 7, ¶ 43, 481 P.3d 479 ("[O]n the record before us . . . we can determine that the district court evaluated the relevant . . . factors and thus substantively made a rule 403 inquiry, even if it never *explicitly* invoked the rule."). Notably, this is the exact "favorable" result that Steele argues a rule 403 motion would have accomplished.

¶33    Steele's contention thus really amounts to claiming that Counsel performed deficiently by never specifically uttering the magic words, "rule 403." But Steele directs us to no authority

which stands for such a sweeping proposition, nor are we prepared to say that Counsel's failure to explicitly invoke rule 403 by numeric designation was deficient here. *Cf. Salt Lake City v. Josephson*, 2019 UT 6, ¶ 12 n.12, 435 P.3d 255 (clarifying that counsel "did not need to utter the 'magic words' of 'single criminal episode statute' to properly preserve the issue"). At the very least, Counsel could reasonable have determined that their substantive rule 403 arguments sufficiently brought the issue to the court's attention. *See Mitchell v. State*, 838 S.E.2d 847, 852 (Ga. 2020) ("Trial counsel was not required to use the specific phrase 'improper expert testimony' . . . to lodge a specific objection on that ground."). This is especially true given that the court appeared to have undertaken the requisite rule 403 balancing and issued the precise ruling that Steele contends such a motion would have achieved—and as before, Steele does not challenge the court's ruling on appeal. *See id.* (explaining that the defendant "cannot establish that his trial counsel was deficient" for not objecting on verbally specific grounds, when trial counsel did substantively object on those grounds and obtained a ruling from the trial court (cleaned up)). Accordingly, we reject Steele's second ineffective assistance claim.

## III. Subsequent Objection

¶34 Steele finally contends that Counsel provided ineffective assistance by objecting to the court's ruling that Wife could testify, but only as Emma's "close acquaintance." *See supra* ¶ 18. Steele asserts that Counsel had no reasonable basis for objecting to "a favorable ruling from the court excluding the prejudicial evidence," and that Counsel's objection "resulted in the court admitting the evidence that [Emma] was married to a woman."

¶35 In arguing why Counsel had "no reasonable basis" for objecting to the court's ruling, Steele posits that Counsel objected either (1) "in an effort to get the court to admit evidence of [Emma's] bisexuality" or (2) because Counsel actually "wanted

the jury to know Wife was married to [Emma]" so that Wife's testimony could be impeached for bias. As to the first option, Steele asserts that it would be unreasonable to object to the ruling with "the hope of admitting evidence of bisexuality," because any objection was likely to be futile "in light of the law" and the stipulation to the rule 412 motion. And as to the second, Steele asserts that it would be an unreasonable trade-off to tell the jury that Emma was married to a woman just so that Counsel could impeach Wife's testimony for bias, given that the "question at trial was consent, and Wife's credibility had minimal bearing on the question of [Emma's] consent."

¶36    As an initial matter, we think it is apparent that Counsel objected to the court's ruling for a reason entirely different from Steele's binary suppositions: Counsel wanted Wife to be excluded from testifying altogether. *See supra* ¶¶ 16–17, 19. Indeed, this is the relief that Counsel unequivocally requested immediately before the court announced the ruling at issue. *See supra* ¶ 17. It seems clear that this is why Counsel framed that ruling as an inadequate half-measure—asserting that the jury would deduce that Wife was married to Emma but that the court's ruling nevertheless would prevent Counsel from impeaching Wife's credibility on that basis. *See supra* ¶ 19. And we cannot find that it was objectively unreasonable for Counsel to harbor concerns that the jury would deduce that Wife was married to Emma and to accordingly act on those concerns by requesting Wife's total exclusion as a witness. In other words, it was not objectively unreasonable for Counsel to object to obtain an even more favorable ruling for Steele. *See Strickland v. Washington*, 466 U.S. 668, 690 (1984) ("[T]he court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to *make the adversarial testing process work* in the particular case." (emphasis added)).

¶37    But even if Counsel objected for one of the reasons Steele suggests, he would still fail to show deficient performance. *See*

*State v. Gallegos*, 2020 UT 19, ¶ 47, 463 P.3d 641 ("[C]ounsel's subjective understanding is not the standard by which her actions are judged."). Steele's arguments amount to asserting that Counsel lacked a valid strategic reason in objecting to the court's ruling, but this, by itself, is insufficient to show that Counsel's decision was objectively unreasonable. *See State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 ("Even if an omission is inadvertent and not due to a purposeful strategy, relief is not automatic." (cleaned up)). Under these circumstances, Steele must show that it was objectively unreasonable for Counsel to fail to anticipate the result complained of: the court eventually doing an about-face on its initial ruling by deciding to admit evidence of Emma's marriage. *See Gallegos*, 2020 UT 19, ¶ 36 ("[T]he question . . . is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." (cleaned up)); *State v. Popp*, 2019 UT App 173, ¶ 26, 453 P.3d 657 ("We judge the reasonableness of counsel's actions on the facts of the particular case, viewed as of the time of counsel's conduct . . . ." (cleaned up)). Steele's briefs are completely silent on this issue, so he fails to demonstrate deficient performance for this reason alone. We thus reject Steele's final ineffective assistance claim.

## IV. Prejudice

¶38 Finally, even if Steele were able to demonstrate that Counsel performed deficiently with respect to any of the foregoing acts or omissions, Steele has still failed to "demonstrate a reasonable probability that the outcome of his . . . case would have been different absent [Counsel's] error[s]." *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350. Steele premises each argument on the same notion: if evidence of Emma's sexual orientation had been presented to the jury differently, a reasonable probability exists that the jury would have acquitted him because it would have

been more inclined to believe that Emma would consent to having sex with a man.

¶39    We are sensitive to the fact that sexual orientation may indeed be used to "impl[y] the impossibility of consent," *State v. Nunez-Vasquez*, 2020 UT App 98, ¶ 40 n.6, 468 P.3d 585 (cleaned up), and undermine our confidence in the verdict as a result. But this is not such a case. Regardless of Emma's sexual orientation, the story Steele relayed to police was unbelievable on its face: Emma enthusiastically initiating sex within thirty minutes of meeting him and then cuddling with him while expressing her excitement about having sex for the duration of the trip, followed by Emma fleeing the truck in a panic and asking for help while "[t]remendously [in] tears," and answering in the affirmative when others asked her if she had been raped. Given the extreme shift between what Steele claims happened in the truck and the undisputed evidence of what happened as soon as Emma stepped outside of it, there is no reasonable probability that the jury would have acquitted Steele of the charges even if evidence of Emma's bisexuality had been admitted, or if Wife had testified only as an acquaintance.[6]

¶40    Moreover, Steele advanced a theory at trial that rendered Emma's sexual orientation irrelevant: the idea that Emma and

---

6. We do not mean to imply that the timing of Emma's reporting or how upset she appeared immediately following the sexual assault renders her version of the events more or less credible. Indeed, we have recognized "the reality that rape victims display a diverse range of reactions to the harm they suffered." *State v. Jok*, 2019 UT App 138, ¶ 24, 449 P.3d 610, *cert. granted*, 456 P.3d 386 (Utah 2019). Instead, we are focusing on the sharp contrast between Steele's narrative of instant attraction with a stated intent to repeat the encounter and Emma's distraught appearance as observed by third parties coupled with an immediate claim of rape.

Wife planned what happened to avoid the $5,000 tuition payment and non-compete clause, which the jury also rejected. Given the incredibility of Steele's version of events, it is understandable why Counsel emphasized this theory. The idea that Steele was duped into having sex with Emma as part of her larger plan to defraud the Company at least offered some explanation for the extreme conflict between what Steele claims happened in the truck and what happened after Emma fled. So, for this additional reason, we do not find a reasonable probability that—had Counsel done everything Steele asserts they should have—the result of the trial would have been different.

CONCLUSION

¶41   Steele did not receive ineffective assistance of counsel. Therefore, we affirm.

_____