2020 UT App 157

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LEE DONALD CRUZ,
Appellant.

Opinion
No. 20190230-CA
Filed November 19, 2020

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 171902757

Emily Adams and Cherise M. Bacalski, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and KATE APPLEBY
concurred.

MORTENSEN, Judge:

¶1     Lee Donald Cruz appeals his conviction for aggravated
kidnapping. He contends his trial counsel provided ineffective
assistance by failing to move for a directed verdict and by failing
to object to the prosecution's introduction of allegedly false
evidence to support his conviction. He also contends the district
court erred at sentencing by failing to resolve his objections to
the presentence investigation report on the record. We affirm the
conviction but remand the issue of Cruz's objections to the
presentence investigation report.

## BACKGROUND[1]

¶2 Cruz and the victim (Victim) started dating in 2015 or 2016 shortly before he served a prison sentence in Arizona. When Cruz was released from prison in early December 2017, Victim picked him up and the two stayed with Victim's uncle in Brigham City, Utah. But Victim quickly decided she no longer wanted to be involved with Cruz, and when she told him so, he became "really, really crazy." Victim pled with Cruz to "just let [her] be" and to allow her to "get on with [her] life." Cruz instead threatened to physically assault her, began following her, and even went to her children's house.

¶3 On December 14, 2017, Victim drove to her friend's (Friend) apartment to hide from Cruz. Friend shared the apartment with Friend's son, son's wife (Daughter-in-law), and their two-year-old son. Victim fell asleep on a couch in the living room while Friend lay awake on a nearby bed with her eyes closed. At approximately 11:30 p.m., Cruz broke into the apartment. Friend opened her eyes and saw Cruz standing over Victim with a gun in his hand.

¶4 Cruz immediately pointed the loaded gun at Victim's face and began yelling and demanding that she leave with him. Victim emphatically and repeatedly told Cruz that she did not want to go anywhere with him, but Cruz continued to point the gun at her face while calling her a "bitch" and demanding that she "get the fuck up off the couch" and "get the fuck in the car

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Liti*, 2015 UT App 186, ¶ 3 n.2, 355 P.3d 1078 (cleaned up). "We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Vallejo*, 2019 UT 38, ¶ 2 n.1, 449 P.3d 39 (cleaned up).

and . . . go." Cruz threatened that he would "blast in [the apartment]" if she did not leave with him.

¶5     Friend watched all of this from the side of her bed. When she got up from the bed, Cruz waved his gun around and demanded to know whose apartment he had entered. As Daughter-in-law entered the living room after hearing the "ruckus" from her room, Friend retreated to a room in the back of the apartment and called the police.

¶6     Meanwhile in the living room, Daughter-in-law expressed her concern that her child was in the apartment. When Victim reiterated this concern, Cruz responded, "I didn't fucking gun at the kids. Get your fucking shit and go." After Daughter-in-law insisted that Cruz leave, he eventually exited the apartment through the front door, shutting it behind him. Daughter-in-law held the door handle and told Victim to "get [her] shit and get out" because "he's crazy . . . waving his gun around in the middle of the apartment." Victim put on her shoes, gathered her bag and car keys, and left minutes later.

¶7     When Victim left the apartment, Cruz was still outside, standing between the apartment complex and a gate leading to the parking lot. Victim then left the apartment complex with Cruz in his car. Once in the car, Cruz told Victim, "[Y]ou're staying with me." Victim protested, indicating that she wanted to go back to her uncle's house in Brigham City to sleep. Cruz instead struck Victim on the back of her head, insisted that she wanted to perform sex acts on him, and took her to the basement of a duplex in Ogden, Utah.

¶8     Police eventually identified the location of the two and arrived at the basement at approximately 1:00 a.m. One of the officers asked Victim, "What's going on tonight?" Victim immediately responded, "I don't know how the hell he found me." Victim told the officer that she did not want to leave Friend's apartment with Cruz, but she left with him because she was "fearful . . . for [her] safety" and concerned for the children

in the apartment. Victim further informed the officer, "I left because [Cruz] was like, 'Bitch, I'm going to blast in here.'" Victim also told the officer that she "didn't want to leave" with Cruz because even before this incident she "ha[d] to really watch [her]self" because of Cruz's "crazy" behavior. Throughout her explanation, Victim continued to express her disbelief that Cruz was able to find her that night. This interaction was recorded on the officer's body camera.

¶9 After Cruz was taken into custody, Victim was threatened by numerous individuals who thought she may cooperate with the State in the criminal case against Cruz. On one occasion, someone claiming to be Cruz's best friend told Victim to "watch [her] ass" if she was "ratting" on Cruz and that it would be crazy if Cruz "[went] down for [Victim]." Victim decided not to pursue charges and told the State that she would not "testify on [Cruz]."

¶10 Cruz also directly contacted Victim about how she should testify. During the initial stages of the criminal proceedings, the district court placed a no-contact order between Cruz and Victim. Despite this order, Cruz called Victim more than 130 times. In these calls, Cruz discussed trial strategy with Victim and directed her that she needed to testify at trial, "say that none of this ever happened" and be "decisive" that he "never forced anybody to do anything."

¶11 Perhaps unsurprisingly, Victim's testimony at trial described a dramatically different version of events than what she told police had transpired on the night of December 14, 2017. At trial, she testified that she was not at Friend's apartment to hide from Cruz; rather, she claimed that she had been with him throughout the entire day of December 14 and that they had planned to drive back to Brigham City together that night. Victim further testified that she had gone to Friend's house with the intent of briefly picking up some items, but accidentally fell asleep there. Victim also denied that Cruz had a gun, denied that

he had threatened to "blast" in the apartment, and claimed she left with Cruz willingly after he simply asked her to because he had to go to work the next morning. Finally, Victim testified that they went to the basement in Ogden because they were too tired to drive to Brigham City.

¶12   The State countered Victim's new version of events by playing audio and video recordings of contradictory statements she made to police and other individuals about what had happened that night. To explain why Victim was testifying to a contradictory version of events, the State also presented evidence that Victim had been threatened over the possibility of her testifying for the State and had been directly contacted by Cruz as to how she was to testify favorably for him.

¶13   It was in this context that the State asked whether Victim "ma[d]e comments" that she "didn't want contact with [Cruz], and [she] wanted a no-contact order." Victim denied she ever said anything to that effect and asked the State to show her an instance when she did. The State then played the following recording of Victim stating to a friend:

> So anyways, so listen. So there's a no-contact order between me and him, okay? I put it there. I don't want nothing to do with him. I don't want to contact him. I don't want him to contact me, whatever. As far as that goes, like I told the cops, hey, I want that information.

The State then played a second recording in which Victim also told a friend:

> [Cruz] probably followed me around. He is psycho in that extent. I do want to put a restraining order, and I want a no-contact order between me and him. And I want to keep that in place, and I'm going to make sure it stays in place.

This was the extent of the State's questions about whether Victim wanted a no-contact order. After hearing all the evidence, the jury convicted Cruz of aggravated kidnapping.[2]

¶14   The district court later held a sentencing hearing, during which Cruz identified three errors in the presentence investigation report (PSI). Cruz conceded that the suggested corrections would not affect his sentence. The district court did not make any oral findings as to whether it accepted Cruz's proposed corrections to the PSI. But in its written final judgment, it did indicate that Cruz made objections to the PSI, listed what they were, and noted that "[t]he corrections d[id] not change" Cruz's sentence.

ISSUES AND STANDARDS OF REVIEW

¶15   Cruz contends his trial counsel provided him with ineffective assistance in two respects. First, Cruz contends counsel was ineffective for not moving for a directed verdict on the aggravated kidnapping count. Second, Cruz contends counsel was ineffective for not objecting to the State playing the first audio recording, which he asserts amounted to the State introducing false evidence. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Abelon*, 2016 UT App 22, ¶ 11, 369 P.3d 113 (cleaned up).

¶16   Cruz further contends the district court erred by failing to resolve his objections to the PSI on the record as required by Utah Code section 77-18-1(6)(a). "Whether the district court complied with its legal duties under section 77-18-1(6)(a) is a question of law that we review for correctness." *Id.* (cleaned up).

---

2. Cruz was also convicted of aggravated burglary. He does not challenge this conviction, so we make no further reference to it.

ANALYSIS

I. Ineffective Assistance of Counsel

¶17 Cruz contends his trial counsel provided him with ineffective assistance. To prevail on an ineffective assistance of counsel claim, the defendant "must demonstrate that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871 (cleaned up). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Hatch*, 2019 UT App 203, ¶ 29, 455 P.3d 1103 (cleaned up).

¶18 Counsel's performance is deficient if, "considering all the circumstances, counsel's acts or omissions were objectively unreasonable," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [the defendant] by the Sixth Amendment." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 (cleaned up). Counsel's performance is prejudicial if there is "a reasonable probability that the outcome of his or her case would have been different absent counsel's error." *Id.* ¶ 43.

A.    Directed Verdict

¶19 Cruz first contends that trial counsel provided ineffective assistance by not moving for a directed verdict on the aggravated kidnapping count. "In evaluating whether a motion for directed verdict would be successful, this court reviews the evidence and all reasonable inferences to be drawn therefrom, and assesses whether some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Hatch*, 2019 UT App 203, ¶ 48 (cleaned up). So long as "the State present[ed] some evidence from which a reasonable jury could find all the elements, trial counsel's decision not to raise a futile motion for a

directed verdict would not be deficient performance." *State v. Baer*, 2019 UT App 15, ¶ 7, 438 P.3d 979 (cleaned up).

¶20 To support the conviction for aggravated kidnapping, the State had to demonstrate that Cruz attempted to commit "either a kidnapping or an unlawful detention . . . in conjunction with aggravating circumstances." *State v. Wilder*, 2016 UT App 210, ¶ 18, 387 P.3d 512; *see also* Utah Code Ann. § 76-5-302(2) (LexisNexis Supp. 2020)[3] (including "attempting to commit" either predicate offense as sufficient to support a conviction for aggravated kidnapping).[4] "As is relevant here, the Utah Code defines kidnapping and unlawful detention as detaining or restraining the victim intentionally or knowingly, without authority of law, and against the will of the victim." *State v. Wright*, 2019 UT App 66, ¶ 37, 442 P.3d 1185 (cleaned up); *see also id.* ¶ 38 (noting that detention or restraint occurs so long as the defendant acted "however briefly, to impair the victim's ability to move freely" (cleaned up)). Accordingly, the State had "to show that [Cruz] engaged in conduct constituting a substantial step towards detaining or restraining [Victim] [that] strongly corroborat[ed] his intent to detain or restrain her." *State v. Fowers*, 2013 UT App 212, ¶ 6, 309 P.3d 1156.

¶21 Cruz concedes that he "may have taken a 'substantial step' towards detaining and restraining [Victim] when he had a gun in his hand and told [her] to leave," but he argues that "the evidence [was] lacking that [his] intent was to commit kidnapping or unlawful detention." He asserts that if he had "the intent to kidnap or unlawfully detain [Victim], he would

---

3. The statutory provisions in effect at the relevant time do not differ from the current provisions in any way material to this case. We therefore cite the current Utah Code for convenience.

4. Cruz does not contest that sufficient evidence was presented to prove the "aggravating circumstances" element.

have put up more of a fight [when Daughter-in-law demanded that he leave], or he would have grabbed [Victim] on his way out." Cruz cites *State v. Wright*, 2019 UT App 66, 442 P.3d 1185, for the proposition that his conduct in the apartment was insufficient to show that his intent was to detain or restrain Victim because his conduct was "assaultive rather than restrictive." *Id.* ¶ 40.

¶22 Cruz's contention is unavailing. Breaking into the apartment and repeatedly threatening Victim at gunpoint while demanding that she leave with him was a substantial step toward detaining Victim against her will that strongly corroborated his intent to do so. And even if Cruz's conduct inside the apartment was somehow insufficient to corroborate his intent, the jury was not required to view this conduct in isolation. Evidence was also presented that Cruz knew Victim wanted him to leave her alone, and that she went to Friend's apartment specifically to hide from him. Cruz's awareness of these facts further corroborated his intention to detain Victim against her will when he broke into the apartment and threatened her at gunpoint. Moreover, Cruz's subsequent conduct in the car corroborated his intent. Cruz insisted that Victim was going to stay with him, and when she instead requested that he take her to Brigham City, Cruz physically assaulted her and took her to a basement in Ogden. Thus, the jury could reasonably infer that Cruz intended to impair Victim's ability to move freely.

¶23 That Cruz left the apartment after Daughter-in-law implored him to do so and did not physically drag Victim with him does not negate the fact that the State presented "some evidence" that corroborated his intent to detain Victim against her will. Instead, Cruz simply points to possibly conflicting evidence of his intent. But "the existence of conflicting evidence alone cannot justify taking the case away from the jury." *State v. Torres*, 2018 UT App 113, ¶ 21, 427 P.3d 550. To the contrary, "when the evidence presented is conflicting or disputed, the jury

serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." *State v. Wall*, 2020 UT App 36, ¶ 53, 460 P.3d 1058 (cleaned up).

¶24    Cruz's reliance on *State v. Wright* is also misplaced. *Wright* involved an argument between Wright and his mother in their home about whether she was interfering with his prescription medication and lying about him to other individuals. 2019 UT App 66, ¶ 40. The mother eventually rose from her chair to walk away, and Wright pushed her back into it and continued yelling at her. *Id.* We held there was insufficient evidence to show that Wright attempted to detain the mother against her will when he pushed her into the chair, reasoning that the context of the push itself was merely incident to the ongoing argument, and there were "no other actions taken by [Wright] to suggest that he intended to impair [his] [m]other's ability to move." *Id.*

¶25    We do not find any persuasive parallels between *Wright* and this case. Importantly, the conduct at issue was not merely incidental to some other argument—Cruz broke into the apartment in which he knew Victim was hiding from him; did so for the sole purpose of getting Victim to leave with him; and pointed a loaded gun at her face to compel her to do so. It is not difficult to infer from Cruz's conduct that he intended to detain Victim when he broke into the apartment. Furthermore, *Wright* acknowledged the difficulty in inferring Wright's intent to detain his mother because nothing else he said or did corroborated such an intent. But that is not the case here—Cruz expressed his intent to detain Victim when he issued the ultimatum that she leave with him or he would "blast" in the apartment. The rationale expressed in *Wright* has no application here.

¶26    Based on the foregoing, we conclude that sufficient evidence was presented to allow a reasonable jury to find that Cruz intended to detain or restrain Victim against her will. Accordingly, trial counsel was not deficient in declining to move

for a directed verdict on the aggravated kidnapping count because it would have been rejected by the district court.

B.     False Evidence

¶27     Cruz next contends that trial counsel provided ineffective assistance by failing to object to the State's use of the audio recording in which Victim indicated that she "put" a no-contact order between herself and Cruz, which he asserts amounted to the State's use of false evidence. The "[S]tate may not knowingly use false evidence to obtain a conviction, even where the false evidence goes only to the credibility of the witness." *State v. Schnoor*, 845 P.2d 947, 949 (Utah Ct. App. 1993). But to prevail on his ineffective assistance claim, it is not enough for Cruz to demonstrate that the State introduced false evidence. Cruz also must show that not objecting to the State's use of the recording was objectively unreasonable. And Cruz must demonstrate there is a reasonable probability that the objection would have been sustained and the verdict would have been different as a result. *See State v. Edgar*, 2017 UT App 54, ¶¶ 17–18, 397 P.3d 656; *see also State v. Doyle*, 2010 UT App 351, ¶ 3, 245 P.3d 206 ("[W]e affirm [the] conviction because there is not a reasonable likelihood that the false testimony affected the jury's ultimate verdict.").

¶28     Cruz argues that Victim's statement that she "put" the no-contact order on him was false, because it "implie[d]" that Victim "request[ed] or instigate[d] the no-contact order," whereas "the State requested the no-contact order" at the initial appearance and made no mention that Victim wanted it. Cruz thus argues that the "State knew [the statement] was false because it was the one who asked for the no-contact order." As to the issue of prejudice, Cruz asserts that "the evidence that [he] kidnapped [Victim] was not strong" and "[w]ithout that statement, the jury would not have believed [Victim] was afraid of [him] and, by extent, did not leave the apartment against her will."

¶29 Even assuming the State introduced false evidence, counsel performed deficiently in failing to object, and the objection would have been sustained, Cruz has not shown a reasonable probability that the recording affected the jury's verdict. Cruz's underlying premise that the evidence against him was "not strong" is unconvincing. As discussed above, there was sufficient evidence, absent this recording, to allow the jury to find that Cruz intended to detain Victim against her will. We are not persuaded that Victim's desire for a no-contact order after Cruz was detained—in a trial where the jury was well aware that Cruz threatened Victim at gunpoint that if she did not leave with him, he would "blast" in the apartment—was somehow the State's lynchpin to proving its case. Indeed, the State was not even required to prove that Victim unwillingly left with Cruz. As discussed above, the State had to demonstrate only that Cruz *attempted* to detain Victim against her will, not that he actually *succeeded* in doing so.

¶30 But even if we were to accept Cruz's argument that the State's case depended on showing that Victim left with Cruz against her will, and that "key to [Victim's] alleged fear was the no-contact order," playing this statement to the jury was still harmless. The State played two recordings in which Victim expressed her desire for a no-contact order and Cruz fails to acknowledge the second. *See State v. Gordon*, 886 P.2d 112, 116–17 (Utah Ct. App. 1994) (holding that false testimony about the defendant's presence at the crime scene was harmless because "there was extensive independent evidence" presented to show the same). In this second recording, Victim specifically indicated that she wanted a no-contact order because Cruz was psychotic and was adamant that she was going to make sure it stayed in place. So irrespective of the statement with which Cruz takes issue, it was still clear that Victim expressed that she wanted a no-contact order. To the extent there is some material difference between Victim wanting a no-contact order and requesting one, Cruz fails to explain the distinction.

¶31 Based on the foregoing, Cruz has not demonstrated a reasonable probability that the State's introduction of the recording affected the jury's verdict. As a result, Cruz cannot prevail on his second claim of ineffective assistance of counsel.

## II. Sentencing Error

¶32 Cruz finally contends that the district court erred by failing to make findings about the accuracy of his objections to the PSI at sentencing. He asserts that no findings were made orally at the hearing and that the written judgment also failed to do so—he argues the written judgment summarized only what defense counsel argued were the errors without making any specific findings as to their accuracy. As a remedy, Cruz seeks only "a limited remand to allow the district court to make findings on the inaccuracies in the PSI." Because the State concedes this point and jointly requests remand, we order a limited remand for this purpose. *See* Utah Code Ann. § 77-18-1(6)(a) (LexisNexis Supp. 2020).

## CONCLUSION

¶33 Trial counsel did not provide Cruz with ineffective assistance. We thus affirm his conviction for aggravated kidnapping. Because there is no objection to a limited remand for the district court to make specific findings regarding the accuracy of Cruz's objections to the PSI, we order limited remand for this purpose.

¶34 Affirmed in part and remanded in part.

———————