**2023 UT App 153**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TYERELL JOE PRZYBYCIEN,
Appellant.

Opinion
No. 20220278-CA
Filed December 14, 2023

Fourth District Court, Provo Department
The Honorable M. James Brady
No. 171401553

Douglas J. Thompson, Attorney for Appellant

Sean D. Reyes and Michael D. Palumbo,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

ORME, Judge:

¶1 For the significant role he played in aiding the suicide of another, the State charged Tyerell Joe Przybycien with murder and abuse or desecration of a dead human body. In two other cases, the State also charged him with five counts of sexual exploitation of a minor and two counts of tampering with a witness. Przybycien eventually pled guilty to one count of child abuse homicide and one count of attempted sexual exploitation of a minor, for which he received concurrent prison sentences. Przybycien did not file a notice of appeal within the 30-day window following sentencing. Instead, nearly two years later, he filed a motion under rule 4(f) of the Utah Rules of Appellate Procedure seeking to reinstate his time to appeal, which motion the district court denied.

¶2      On appeal, Przybycien challenges the denial, arguing that his trial attorneys (Counsel)[1] rendered ineffective assistance, thereby depriving him of his constitutional right to appeal. Specifically, he argues that Counsel were ineffective under *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), for failing to consult with him about a potential appeal after sentencing. Because, under the circumstances of this case, we conclude that Counsel did not perform deficiently in not consulting with Przybycien post-sentence, we affirm the district court's denial of the rule 4(f) motion.

BACKGROUND

*Arrest and Plea Agreement*

¶3      In the Spring of 2017, sixteen-year-old J.B. confided in eighteen-year-old Przybycien that she was suicidal.[2] In response, Przybycien told her, "I'll make it happen for you if that's what you want." He subsequently encouraged her suicidal thoughts and told her that he also planned to commit suicide "at some point."

¶4      A few weeks later, in early May, a turkey hunter came across J.B.'s body hanging from a noose tied to a tree. The hunter called the police, who arrived at the scene soon thereafter. At J.B.'s feet, the police found "a receipt for the purchase of rope" containing Przybycien's name, "a smart phone, a handwritten

---

1. In the proceedings before the district court, Przybycien was represented by two attorneys. For simplicity, unless otherwise indicated, we refer to them collectively as Counsel.

2. The factual recitation of the conduct underlying Przybycien's convictions is derived from the "Factual Basis for the Crimes Charged" section of Przybycien's plea agreement.

suicide note referring to a video on the phone and a can of industrial strength air duster."

¶5      The phone contained a video recording of J.B.'s death taken from "just a few feet away." It showed J.B. alive with a noose around her neck holding a shirt in one hand and the can of air duster in the other. She was standing on what was later discovered to be a "pedestal" consisting of "a rock and a piece of wood." Przybycien's voice is then heard asking J.B. "to say something," following which J.B. inhaled "a large amount of the air duster," lost consciousness, and fell "in a twisting motion." The video continued for another 10 minutes, during which Przybycien continued to ask J.B. questions. J.B. was unresponsive to Przybycien's questions, but her body made "what appear[ed] to be slight involuntary movements until she expire[d]." Przybycien did not attempt to save J.B.'s life. Instead, "he can be heard saying her body should be depleted of oxygen."

¶6      While the police were at the scene, Przybycien returned, approached the officers, and agreed to an interview. During multiple interviews with the police, Przybycien admitted to researching how to tie a noose, purchasing the rope, testing it to ensure it was sufficiently tight and long, and tying the noose. He also admitted that he purchased the air duster and constructed the makeshift "pedestal." Further, he told police that on the night in question, he picked J.B. up from work and took her to the scene of her suicide where he twice watched her inhale the contents of the air duster and pass out—once without and once with the noose around her neck. He stated, "I feel like I did murder her. That's what it is. Because I helped her so much. And that was my plan. That was my plan."

¶7      For his conduct relating to J.B.'s death, the State charged Przybycien with murder, a first-degree felony, and abuse or

desecration of a dead human body, a class B misdemeanor.[3] Following a preliminary hearing and additional written argument from both sides, particularly on the issue of causation for the murder charge, the district court issued a written ruling binding the case over for trial.

¶8 In a separate case, based on images of child pornography that police found on Przybycien's cellphone as part of their investigation into J.B.'s death, the State charged Przybycien with five counts of sexual exploitation of a minor, second-degree felonies. And in a third case, the State charged Przybycien with two counts of tampering with a witness.

¶9 On September 4, 2018, three months before trial was scheduled to begin on the charges related to J.B.'s death, the court held a telephonic conference at which Przybycien was not present. At the hearing, the court stated that

> the big question was whether or not the State of Utah had a charge that fit the factual circumstances of this case.
>
> It seemed that at the preliminary hearing that issue came up, and I was uncertain as to what other fact disputes there might be between the parties; but as it was indicated to me the matter will be going to a jury, I wondered if this isn't the kind of case that would be appropriate for either motions prior to trial to address the legal issues, or perhaps even a

---

3. At the time of J.B.'s death, our Legislature had not yet amended the manslaughter statute to include the intentional aiding in the commission of suicide as a variant of the offense. *Compare* Utah Code Ann. § 76-5-205(1) (LexisNexis 2017), *with id.* § 76-5-205(2)(b) (Supp. 2022).

> *Sery* type plea[4] where the parties could preserve their rights.
>
>    . . . I'm assuming that regardless of how this Court rules or how the jury rules, the legal question is a question that probably needs a higher authority than the trial Court in order to resolve it. So I'm anticipating that either side could choose to appeal it.
>
>    So I guess my question really comes down to . . . [i]s this a fact case or is this a law case, and how do you want to proceed; and if this doesn't mean anything to you, we'll just go forward with the trial.

¶10   Both sides agreed that the case turned primarily on the legal issue of whether Przybycien "caused the death of another." Counsel then indicated that they would discuss with Przybycien the possibility of a *Sery* plea that would allow him to "tak[e] the legal issue up on appeal."

¶11   Almost two months later, Przybycien entered a plea agreement in which he pled guilty to one count each of child abuse homicide and attempted sexual exploitation of a minor, a first-degree felony and a third-degree felony, respectively. In exchange, the State dismissed all remaining charges from all three cases and agreed to recommend that the sentences for both

---

4. As codified in rule 11(j) of the Utah Rules of Criminal Procedure, "a *Sery* plea is a conditional plea in which a defendant pleads guilty (or no contest) but reserves the right to appeal the trial court's denial of a motion to suppress certain evidence. If the appellate court reverses the denial of that motion, the defendant's plea is withdrawn." *Kamoe v. Ridge*, 2021 UT 5, ¶ 23, 483 P.3d 720 (quotation simplified). *See State v. Sery*, 758 P.2d 935, 937–39 (Utah Ct. App. 1988). Przybycien did not enter such a plea in this case.

charges to which Przybycien pled guilty be run concurrently. In relevant part, as emphasized in the plea agreement, Przybycien acknowledged, "I understand that I am giving up my right to appeal my *conviction* if I plead guilty" and "I understand that if I plead guilty and wish to appeal my *sentence* I must file a notice of appeal within thirty (30) days after my sentence is entered."

¶12 At the change-of-plea hearing, the district court ensured that Przybycien understood the terms of the plea agreement and that the charges to which he was pleading guilty "carr[ied] with them the possibility of incarceration at the Utah State Prison for not less than five years and up to life on the first-degree felony and for up to five years on the third-degree felony." Counsel indicated that the agreement had been discussed with Przybycien twice within the past 24 hours. The court also confirmed that Przybycien was entering his pleas "freely and voluntarily." Following a reading of the factual bases for the charges contained in the agreement, which Przybycien agreed were accurate, Przybycien signed the plea agreement before the court. The court accepted the pleas and set the matter for sentencing.

¶13 In December 2018, the district court held the sentencing hearing. Counsel emphasized, among other things, Przybycien's young age, "developing mind," and feelings of remorse. After acknowledging that it was "a big ask," Counsel requested that Przybycien "serve two years at the Utah County Jail," followed by 60 months of supervised probation. The State asked the court to sentence Przybycien to prison and that "the Board of Parole . . . hold him as long as necessary for him to show that he is . . . no longer a danger to our community, which for him, unfortunately, may be for the rest of his natural life."

¶14 After reviewing letters and other documents submitted from both Przybycien's and J.B.'s friends and family, the district court sentenced Przybycien to concurrent prison terms. For the child abuse homicide conviction, the court sentenced him "to an

indeterminate term in the Utah State Prison of not less than five years, but which may be for life." And for the attempted sexual exploitation of a minor charge, the court sentenced him "to an indeterminate term in the Utah State Prison not to exceed five years."

¶15 The district court next told Przybycien, "[Y]ou have the right to appeal my decision within the next 30 days if you choose to do so. You also have the right to have a State appointed attorney assist you in preparing that [appeal] if you cannot afford your own attorneys; do you understand that?" Przybycien responded, "Yes."

*Rule 4(f) Motion*

¶16 Nearly two years later, in September 2020, Przybycien filed a pro se motion with the district court seeking to reinstate his time to file an appeal under rule 4(f) of the Utah Rules of Appellate Procedure.[5] Later, represented by appellate counsel, he filed an amended rule 4(f) motion in which he asserted that "[a]t no time prior to his plea, before sentencing, or within the 30-day time limitation" to appeal his sentence did Counsel ever discuss with him "the possibility of filing an appeal from the sentence," "an appeal challenging the applicability of a homicide charge to the facts of the case," or "the possibility of raising a challenge based on the passage of House Bill 086, 2018, in which the legislature created the crime of aiding another individual to commit suicide."

---

5. The district court denied Przybycien's pro se motion on the ground that he "failed to serve a copy of his motion . . . on all other parties." On appeal from that denial, the State conceded that it was, in fact, served with the motion and accordingly requested summary reversal and remand. The State's request was well taken, and the case was remanded to the district court to consider the merits of the motion.

¶17 The district court[6] held an evidentiary hearing on the motion at which Przybycien and Counsel testified. Przybycien acknowledged that although he had been informed, both prior to entering the plea agreement and at sentencing, of the 30-day window to appeal his sentence, he did not "make any effort to have that sentence appealed within 30 days from the sentence." He also acknowledged that he was not prohibited or prevented from appealing his sentence at the time.

¶18 Przybycien further testified that he did not recall discussing the September 4, 2018 pre-trial conference with Counsel. It was not until "[s]ometime in 2020" that Przybycien obtained and read the transcript of the hearing, and he testified that he did not recall Counsel ever discussing with him the district court's concern expressed at the hearing about whether "the State had a charge that fit the actual circumstances of the case." He also testified that Counsel did not discuss with him the possibility of a *Sery* plea or that the question of causation was a legal question "that probably need[ed] a higher authority than the trial Court in order to resolve it"—both of which issues the court had suggested at that hearing.

¶19 At the conclusion of Przybycien's testimony, the district court made "a general statement" regarding the questioning that suggested that the court had been "worried about causation" at the pre-trial hearing. The court stated that it was unsure whether "the phrasing" that it "was worried" or "was concerned" was "an accurate portrayal" because its recollection was that it "may have raised questions and had discussions" regarding whether "the case was going to move forward either on a factual or legal basis."

---

6. The same judge who took Przybycien's plea and issued his sentence presided over the evidentiary hearing related to the rule 4(f) motion and ruled on the motion.

But, the court stated, "if the record is different, we'll go by the record."

¶20 One of Przybycien's trial attorneys testified at the evidentiary hearing that he and co-counsel discussed "the legal issue of causation" with Przybycien "[m]ultiple times," including "generally what the Court indicated" at the September 4, 2018 pre-trial conference. He also stated that they discussed with Przybycien the law amending the manslaughter statute to include aiding in the commission of suicide and that they did so both before and after its passage in May 2018, for a total of "more than five times."[7] And on "multiple" occasions, they also went over "the risks and rewards of moving forward to trial versus resolving his case by way of a plea bargain," which included discussion of possible sentencing scenarios of "plea deal versus going to trial" with the aid of "matrix estimates." He stated that he and co-counsel "spent a lot of time with [Przybycien] at the jail" discussing "strategy decisions" and that they "were very thorough." He also believed that at the time of sentencing, Przybycien had been "fully advised of his right to appeal." He also stated that "before sentencing we talked about the option of appealing the sentence if he was sent to prison and he did not get probation. I do remember generally speaking about that option with him."

¶21 The attorney testified that he did not remember visiting Przybycien in prison during the 30-day window, but that he did remember that in the 30 days after Przybycien's sentence was imposed, he received "multiple messages" from Przybycien by way of his mother, none of which mentioned a possible appeal.

---

7. Indeed, the attorney testified that, based on the 2018 amendment to the manslaughter statute, *see supra* note 3, Przybycien authorized them to offer "to resolve the case as a second-degree felony manslaughter case." The State rejected this offer.

Instead, the messages addressed Przybycien's desire "to be interviewed for the 48 Hours CBS show regarding this case, and also about how he was doing at the prison with his cell mate and the different types of jobs he was doing."

¶22 The other trial attorney also did not remember visiting Przybycien in prison during the 30-day window to revisit the question of a possible appeal following sentencing. He testified that "one of the reasons we resolved the case the way we did is because the charge" of child abuse homicide "matrixed at substantially less than the murder conviction would have, at about half." He stated that he and his co-counsel had discussed with Przybycien "the matrix, the likelihood of a prison sentence and what the matrix suggested might be an appropriate incarceration period before parole would be granted." Based on this, he believed they had informed Przybycien "that prison was the most likely option, but that we could ask for probation" although "it was a longshot." He also confirmed that Przybycien had hoped for probation.

¶23 The district court issued a written order denying Przybycien's rule 4(f) motion. The court found the testimony of Counsel to be "more credible than the testimony of" Przybycien. Accordingly, the court found that "at some time after the September 4, 2018, hearing," Counsel informed Przybycien of the hearing and told him "generally about the topics discussed," including "that the issue of causation was the primary legal issue in the case and that an appeal may be necessary to resolve that issue." The court further found that Counsel discussed "the possibility of filing further motions, filing interlocutory appeal, . . . proceeding to trial," and a *Sery* plea with Przybycien.

¶24 The district court next stated "that the issue of reinstatement of an appeal by [Przybycien] is limited" to "whether [he] was denied his right to appeal his sentence." Accordingly, the court held that "[a]ny effort to address

effectiveness of counsel and other issues leading up to [Przybycien's] plea" would need to be addressed through the Post-Conviction Remedies Act.

¶25   In addressing whether Przybycien was deprived of his right to a direct appeal, the court stated,

> Prior to his entry of plea [Przybycien] was informed in writing and through consultation with his attorneys of his right to file an appeal and the time requirement for filing an appeal. At sentencing he stated he understood the written document and did not need more time to review it with his attorneys. After sentencing, [Przybycien] was told by the Court that he had the right to appeal the sentence, and the time requirements for filing. He was told if he could not afford an attorney to assist him with an appeal, the Court would consider appointing an attorney. Following sentencing [Przybycien] did not instruct his attorneys to file a direct appeal. [Przybycien] did not attempt to file an appeal on his own.

The court further noted that Przybycien did not claim that Counsel "failed to file a direct appeal after agreeing to do so," that "he diligently attempted to file a timely appeal but was unable to do so through no fault of his own," or that "either the court or [Counsel] failed to advise him of the right to appeal." *See Manning v. State*, 2005 UT 61, ¶ 31, 122 P.3d 628 (listing three examples of deprivation of the right to appeal), *superseded by rule*, Utah R. App. P. 4(f). Instead, Przybycien's argument was limited to asserting that he was denied the right to appeal because Counsel "did not meet with him following his sentencing hearing to further discuss whether he wanted to file an appeal."

¶26   The court stated that Przybycien "candidly argued that one of his goals is to expand the case law on rule 4(f)" to "require all

defense counsel to consult with their clients following a sentencing hearing," but the court was not willing to "attempt to modify or expand rule 4(f) to meet [Przybycien's] desired policy." Accordingly, the court ruled that Przybycien "was not deprived of his right to a direct appeal" and denied the motion.

¶27   Przybycien appeals.

## ISSUE AND STANDARDS OF REVIEW

¶28   Przybycien argues that the district court erred in denying his rule 4(f) motion to reinstate his time to file a notice of appeal.[8] "We review for correctness the court's legal conclusion that [Przybycien] was not denied his right to appeal, but we give deference to the court's factual findings, reviewing them for clear error." *State v. Blanke*, 2023 UT App 113, ¶ 15, 537 P.3d 654.

## ANALYSIS

¶29   Under Article I, Section 12 of the Utah Constitution, criminal defendants have "the right to appeal in all cases." But this right is limited by, among other things, rule 4(a) of the Utah Rules of Appellate Procedure, which requires a criminal defendant to file a notice of appeal within 30 days from the time

---

8. After Przybycien filed his notice of appeal, this court issued an order stating, "Pursuant to Rule 10(b) of the Utah Rules of Appellate Procedure this matter has been selected to be resolved through a simplified appeal process." *See generally* Utah R. App. P. 10(b)–(c). In his memorandum, Przybycien also argued that we should rescind this order and "grant [him] the opportunity for full briefing and oral argument." Oral argument was heard in this case—it is not foreclosed by an order calling for the submission of memoranda in lieu of full briefing—during which Przybycien "formally waiv[ed]" his request for additional briefing.

of sentencing. *See* Utah R. App. P. 4(a) ("[T]he notice of appeal . . . must be filed with the clerk of the trial court within 30 days after the date of entry of the judgment or order appealed from."); *State v. Bowers*, 2002 UT 100, ¶ 4, 57 P.3d 1065 ("In a criminal case, it is the sentence itself which constitutes a final judgment from which appellant has the right to appeal.") (quotation simplified). This 30-day limit "is jurisdictional in nature, meaning that an appellate court simply has no power to hear the case if a notice of appeal is untimely." *State v. Collins*, 2014 UT 61, ¶ 22, 342 P.3d 789 (quotation simplified). *See id.* ¶ 21 (stating that to exercise the constitutional right to appeal, "defendants must properly invoke the appellate court's jurisdiction" because "appellate courts do not enjoy unlimited power to review the actions of trial courts and cannot conjure jurisdiction") (quotation simplified).

¶30 An exception to this general jurisdictional bar is found in rule 4(f) of the Utah Rules of Appellate Procedure, the purpose of which "is to provide criminal defendants who have been deprived of an appeal through no fault of their own with an avenue for relief." *State v. Brown*, 2021 UT 11, ¶ 16, 489 P.3d 152. The rule directs, in relevant part, that "[u]pon a showing that a criminal defendant was deprived of the right to appeal, the trial court shall reinstate the thirty-day period for filing a direct appeal." Utah R. App. P. 4(f). Under the rule and relevant caselaw, for the exception to apply, a criminal defendant must "show (1) deprivation of the right to appeal and (2) that an appeal would have been taken had the defendant been properly informed of the right." *State v. Blanke*, 2023 UT App 113, ¶ 16, 537 P.3d 654. *See Collins*, 2014 UT 61, ¶ 28 ("[B]oth our reinstatement caselaw and rule 4(f) of the Utah Rules of Appellate Procedure require that a defendant show he has been 'deprived' of the right to appeal. And this deprivation requirement implicitly recognizes that reinstatement is appropriate only where the defendant can show that he would have appealed had he been properly informed.").

¶31 Under the first element, to establish deprivation of the right to appeal, defendants "must demonstrate that they are not the cause of the loss of their right to appeal" by "point[ing] to some other party—typically, counsel or the trial court—that is at fault for the deprivation of the right to appeal." *State v. Stewart*, 2019 UT 39, ¶ 32, 449 P.3d 59. *See Collins*, 2014 UT 61, ¶ 24 ("Relief is not available to a defendant properly informed of his appellate rights who simply lets the matter rest, and then claims that he did not waive his right to appeal.") (quotation simplified). Indeed, rule 4(f)'s use of "the term 'deprived' is crucial. That word encompasses a narrow range of situations where a defendant would have appealed, but had that right taken away or was kept from the possession, enjoyment, or use of that right." *Stewart*, 2019 UT 39, ¶ 33 (quotation simplified).

> Such circumstances would include: (1) the defendant asked his or her attorney to file an appeal but the attorney, after agreeing to file, failed to do so, (2) the defendant diligently but futilely attempted to appeal within the statutory time frame without fault on defendant's part, or (3) the court or the defendant's attorney failed to properly advise defendant of the right to appeal.

*Manning v. State*, 2005 UT 61, ¶ 31, 122 P.3d 628 (quotation simplified), *superseded by rule*, Utah R. App. P. 4(f).[9] *See Stewart*, 2019 UT 39, ¶ 34.

---

9. The procedure for reinstating the time to appeal was originally articulated in *Manning v. State*, 2005 UT 61, ¶¶ 26–33, 122 P.3d 628, and later codified in rule 4(f) of the Utah Rules of Appellate Procedure. *See State v. Brown*, 2021 UT 11, ¶¶ 14–15, 489 P.3d 152; *State v. Collins*, 2014 UT 61, ¶ 23, 342 P.3d 789. Although "*Manning* has been supplanted by rule 4(f)," *Brown*, 2021 UT 11, ¶ 13, and

(continued…)

¶32   Przybycien argues "that his right to competent counsel includes the right to be consulted with regarding an appeal as established in" *Roe v. Flores-Ortega*, 528 U.S. 470 (2000). Accordingly, he contends that he received ineffective assistance when Counsel "neglect[ed] to consult with him, an 18 year-old, about an appeal after he was sentenced to serve a life sentence in prison" and that this ineffective assistance deprived him of his right to appeal, as required under rule 4(f). Because we hold that Counsel did not perform deficiently in not consulting with Przybycien post-sentence regarding his appeal prospects, his argument necessarily fails.[10]

---

therefore "does not supply a valid procedural basis for accessing the right to appeal separate and apart from rule 4(f)," *id.* ¶ 15, *Manning* nevertheless "inform[s] the discussion of what rule 4(f) means by 'deprived of the right to appeal,'" *id.* ¶ 16. *See State v. Stewart*, 2019 UT 39, ¶ 35, 449 P.3d 59 ("*Manning* and the examples [of deprivation of the right to appeal] cited therein align with the language of rule 4(f)."). We note, however, that the advisory committee's note for rule 4(f) that previously referenced *Manning* has since been removed. *Compare* Utah R. App. P. 4(f) advisory committee's note (2019) ("Paragraph (f) was adopted to implement the holding and procedure outlined in *Manning v. State*, 2005 UT 61, 122 P.3d 628."), *with id.* R. 4(f) (2020) (containing no advisory committee note and noting in the amendment notes that "[t]he 2020 amendment deleted that Advisory Committee note").

10. Przybycien additionally argues that the district court erred in limiting its analysis of his rule 4(f) motion to the three examples of deprivation of the right to appeal articulated in *Manning* and argues that "the ineffective assistance of counsel analysis described by the U.S. Supreme Court in" *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), "can be used to consider whether a defendant had

(continued…)

¶33 A claim of ineffective assistance of counsel requires an appellant to show both that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Cruz*, 2020 UT App 157, ¶ 17, 478 P.3d 631 (quotation simplified), *cert. denied*, 481 P.3d 1040 (Utah 2021). Here, we need only discuss the first prong of the inquiry.

¶34 To satisfy the deficient performance prong, the appellant must show that defense counsel's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. This standard is "highly deferential" to defense counsel in that the defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and "the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable," *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. *See Strickland*, 466 U.S. at 688 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").

¶35 In *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), the United States Supreme Court addressed ineffective assistance of counsel in the

---

been 'deprived' of the right to appeal under Rule 4(f)." The State argues that "[e]ven assuming that rule 4(f) permits reinstatement based on a showing of ineffectiveness of counsel, [Przybycien] fails to show trial counsel was ineffective." We ultimately hold that Przybycien did not receive ineffective assistance under *Flores-Ortega*, and so we need not consider whether ineffective assistance of counsel might constitute an independent basis for concluding there was deprivation of the right to appeal under rule 4(f).

context of attorney consultations regarding possible appeals. Although stating that "the better practice is for counsel routinely to consult with the defendant regarding the possibility of an appeal," *id.* at 479, the Court specifically rejected a "bright-line rule that counsel must always consult with the defendant regarding an appeal," *id.* at 480. Instead, the Court held that

> counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.

*Id.* Such a determination can be made "[o]nly by considering all relevant factors in a given case." *Id.* "Although not determinative, a highly relevant factor in this inquiry [is] whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Id.* A further consideration is "whether the defendant received the sentence bargained for as part of the plea." *Id.*

¶36 Przybycien argues that Counsel had a duty under both rationales to consult with him regarding his right to appeal his sentence. We address each in turn.

¶37 Initially, Przybycien argues that Counsel had a duty to consult with him about his right to appeal "because a rational defendant, under the circumstances, would want to appeal from the district court's sentencing order, sending [him], an 18 year

old[11] to prison" and that Counsel therefore performed deficiently in not doing so. Specifically, he asserts that circumstances relevant to the determination "include the judge's expressed concern that the State did not have a factual circumstance that met the elements of homicide as there was real doubt whether [he] caused the death in question." He further contends that a rational defendant would be motivated to appeal "to avoid the onerous procedural bars of the Postconviction Remedies Act." Lastly, he asserts that a reasonable defendant would have wanted to appeal to raise a claim of ineffective assistance on the ground that Counsel failed to raise the district court's concerns relating to legal causation at sentencing as a justification for probation.

¶38    Additionally, although one of his trial attorneys testified that prior to sentencing he did discuss with Przybycien the possibility of appealing an unfavorable sentence and that he believed Przybycien to have been "fully advised of his right to appeal" at the time of sentencing, Przybycien argues that the record does not establish that he was consulted regarding his right to appeal. He asserts "that being *advised* of the right to appeal (either in the written plea statement, or in pre-plea discussion with counsel, or by the judge at sentencing) is not the same as post-judgment *consultation* about the pros and cons of an appeal on the specifics of the case, and an earnest attempt to determine the defendant's wishes with respect to the right to appeal." Indeed, this definition of "consult" comports with *Flores-Ortega*, in which the Court clarified that it "employ[ed] the term 'consult' to convey a specific meaning—advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* at 478. But even assuming that Counsel did not consult with Przybycien regarding his right to appeal either before or after sentence was

---

11. We note that while Przybycien was 18 years old at the time of J.B.'s death, he was actually 19 at the time of sentencing.

announced, under the circumstances of this case, Counsel did not perform deficiently in not doing so.

¶39 Here, the "highly relevant factor in" the deficient performance inquiry, i.e., "whether the conviction follows a trial or a guilty plea," *id.* at 480, weighs against Przybycien. Indeed, "the scope of potentially appealable issues," *id.*, to which he points is limited to the legal question of whether he caused J.B.'s death. Przybycien acknowledges, however, that his right to appeal, if reinstated under rule 4(f), would be limited to challenging his sentence—not the underlying guilty plea. *See State v. Nicholls*, 2017 UT App 60, ¶ 19, 397 P.3d 709 ("A defendant who pleads guilty waives the right to a direct appeal of the conviction on the crime charged.") (quotation simplified), *cert. denied*, 400 P.3d 1046 (Utah 2017). Nevertheless, he asserts that "he is trying to reinstate the right to appeal from the sentence issued by the judge that had questioned 'whether or not the State of Utah had a charge that fit the factual circumstances of this case' and yet still sentenced [him] to serve 5–life in prison."

¶40 Although Przybycien places great emphasis on the district court's concerns regarding legal causation in this case—which, at the rule 4(f) evidentiary hearing, the court denied having—any such concern played little to no role at the sentencing stage. Namely, "by pleading guilty, the defendant is deemed to have admitted all of the essential elements of the crime charged and thereby waives all nonjurisdictional defects." *State v. Rhinehart*, 2007 UT 61, ¶ 15, 167 P.3d 1046 (quotation simplified). Thus, by the sentencing stage, any concerns regarding legal causation had been resolved by virtue of the plea agreement. For this same reason, Przybycien's argument that a reasonable defendant would have appealed in an effort "to avoid the onerous procedural bars of the Postconviction Remedies Act" is likewise unavailing.

¶41    Furthermore, the consideration of "whether the defendant received the sentence bargained for as part of the plea," *Flores-Ortega*, 528 U.S. at 480, also weighs against Przybycien. In the plea agreement, the State, having agreed to drop six of the eight charges pending against Przybycien and to amend the other two, agreed only to recommend that the sentences for both remaining charges run concurrently. And the district court did, in fact, accept that recommendation and sentence Przybycien to concurrent prison terms.

¶42    Additionally, although Przybycien had hoped for probation but instead received a sentence of five-years-to-life, the record shows that he "obtained a sentence that should have been expected." *Manning v. State*, 2004 UT App 87, ¶ 33, 89 P.3d 196, *aff'd on other grounds*, 2005 UT 61, 122 P.3d 628. One of his trial attorneys testified that one reason Przybycien pled guilty to child abuse homicide was that it "matrixed at substantially less than the murder conviction would have, at about half." He also stated that Counsel had discussed with Przybycien "that prison was the most likely option" and that they "could ask for probation" but "it was a longshot." This is further bolstered by the acknowledgment Counsel made to the district court at sentencing that the request for "two years at the Utah County Jail," followed by 60 months of supervised probation, was "a big ask."

¶43    For these reasons, we cannot say that, under the circumstances of this case, "a rational defendant would [have] want[ed] to appeal" the sentence Przybycien received. *Flores-Ortega*, 528 U.S. at 480.

¶44    Alternatively, Przybycien contends that he "reasonably demonstrated to counsel that he was interested in appealing," *id.*, because his sentence of five-years-to-life did not match the two years in jail and probation that Counsel sought at sentencing and because Counsel confirmed in the subsequent rule 4(f) evidentiary hearing that Przybycien had hoped for probation. But

as discussed above, although Przybycien would have preferred probation, he was advised that such a sentence was unlikely, and his hope for probation was quite unrealistic, all things considered. Thus, this desire expressed prior to sentencing, without more, was insufficient to reasonably demonstrate to Counsel a desire to appeal.

¶45　More importantly, despite being informed at sentencing that he had 30 days to appeal his sentence, Przybycien did not undertake any action that would reasonably demonstrate to Counsel that he wished to file a notice of appeal. Indeed, at the evidentiary hearing on his rule 4(f) motion, Przybycien conceded that he did not "make any effort to have that sentence appealed within 30 days from the sentence." To the contrary, although Przybycien sent "multiple messages" to Counsel during the 30-day window, none of the messages mentioned appeal, much less did they convey an "interest[] in appealing." Przybycien's attentions appear to have instead been focused on a potential television interview, his cellmate, "and the different types of jobs he was doing." This is the behavior of someone resigned to his fate, even while hoping for some media attention, rather than someone wishing to appeal or at least revisit the possibility of appealing his sentence.

¶46　Accordingly, for the stated reasons, this claim of deficient performance under *Flores-Ortega* likewise fails.

CONCLUSION

¶47　Under the circumstances of this case, Przybycien has not established that Counsel performed deficiently in not taking the initiative to consult with him concerning a potential appeal following sentencing. We therefore affirm the district court's denial of his motion under rule 4(f) of the Utah Rules of Appellate Procedure to reinstate the 30-day period to appeal his sentence.

_____